UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JOAN GROENING,

    Plaintiff,                                                      Case No. 15-cv-

v.                                                                               Hon.

GLEN LAKE COMMUNITY SCHOOLS,
FRAN SEYMOUR, ROSS HAZELTON,
CHERIE HAWKINS, LAURA AYLSWORTH-BONZELET,
and PATRICK MIDDLETON,

    Defendants.

Eugenie B. Eardley (P48615)
Nicholas F.X. Gumina (P74023)
Attorney for Plaintiff
Eardley Law Offices, P.C.
8 East Bridge St, Suite B
Rockford, MI 49341
(616) 874-2647
genieb@eardleylaw.com
nickg@eardleylaw.com

## Plaintiff's Complaint and Demand for Jury Trial

NOW COMES the Plaintiff, Joan Groening, by and through her attorneys, Eardley Law Offices, P.C., and in support of her Complaint against the Defendant, hereby states as follows:

### A.  Statement of Jurisdiction

1.     The Plaintiff, Joan Groening is a resident of the County of Leelanau, State of Michigan, and was an employee of Glen Lake Community Schools from 2000-2015.

2.     The Defendant, Glen Lake Community Schools, is a local educational agency, ("LEA") in the State of Michigan, providing public education to the students of the District, and is subject to the Family and Medical Leave Act,  29  U.S.C. § 825.104(a) as an employer.

1

3. Defendant, Fran Seymour was the Chair of the Glen Lake Community Schools Board in January 2014 to present, and an Employer of Plaintiff as defined under the Family and Medical Leave Act and case law.

4. Defendant, Ross Hazelton is and was a member of the Glen Lake Community Schools Board from 2014 to present and an employer of Plaintiff as defined under the Family and Medical Leave Act and case law.

5. Defendant Cherie Hawkins is and was a member of the Glen Lake Community Schools Board was an employer of Plaintiff from 2014 to present as defined under the Family and Medical Leave Act and case law.

6. Defendant Laura Alysworth-Bonzelet is and was a member of the Glen Lake Community Schools Board, from 2014 to present was an employer of Plaintiff as defined under the Family and Medical Leave Act and case law.

7. Defendant Patrick Middleton is and was a member of the Glen Lake Community Schools Board, from 2014 to present was an employer of Plaintiff as defined under the Family and Medical Leave Act and case law.

8. The Plaintiff was employed by the Defendant Glen Lake Community Schools from 2000-2006, first as Business Manager and then Director of Finance, and then as the Superintendent of Glen Lake Community Schools per a contract of employment from 2006 until her forced resignation under duress in August 2015.

9. This Honorable Court possesses personal jurisdiction over all the named Defendants.

10. Plaintiff alleges violations of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et. seq.* (hereafter FMLA); therefore, this Honorable Court possesses subject matter jurisdiction.

11. Venue is proper in the United States District Court for the Western District of Michigan.

### B. Factual Allegations

Plaintiff incorporates all prior averments, as if fully set forth herein.

12. The Plaintiff, was the Superintendent of Glen Lake Community Schools, and has been since her hire in that role since 2006.
13. The Plaintiff was continuously employed by the defendant for more than 12 months prior to July 1, 2014, and performed well, receiving numerous positive evaluations stating that she met or exceeded expectations, and rated highly effective, along with pay increases.
14. Plaintiff worked more than 1250 hours for the defendant in the 12 months prior to July 1, 2014, and Glen Lake Community Schools is exempt from the 50 employee rule, but there are sufficient school employees within 75 miles to qualify under 29 C.F.R. § 825.600 and 29 U.S.C. § 2654.
15. Plaintiff used FMLA for a hip replacement surgery, which occurred on October 17, 2014, and she was on such leave until November 30, 2014.
16. Mike Hartigan, a retired Superintendent, filled in for Plaintiff while she was gone.
17. Plaintiff was in continual contact with the Board, Mike Hartigan and other school officials, despite being on FMLA.
18. While Plaintiff was on FMLA, the Board held a work session regarding performance evaluations of school administrators, initiated by the teacher's union president's desire to complain about the high school principal's performance and see his evaluation.
19. Plaintiff learned about this from Mike Hartigan and Fran Seymour.
20. Plaintiff, in her role as Superintendent, was aware of the teacher's union upset with Konrad Molter due to his implementation of a new evaluation process for teachers, and she had not made the evaluation of Molter available to the teachers.
21. Mike Hartigan told Plaintiff he would not attend, as it was not his Board.
22. Plaintiff had been advised in the past by counsel for Thrun Law Firm, Kevin Harty, that administrator evaluations were not to be dictated by the Board, and they were to approve, not intervene.

23. Fran Seymour and Kevin Harty arranged with the Union and others to make a Freedom of Information Request to obtain the evaluations of all three administrators, Konrad Molter, Kim Wright and Joan Groening, eventually, which were released under FOIA.

24. Plaintiff attended the work session, because it necessitated her attendance about development of policies, despite being on heavy pain medication and on FMLA.

25. There had not been a FOIA request for administrator evaluations before during Plaintiff's time as Superintendent, and in her tenure, when the issue had been raised, she had been directed to follow Board Policy No. 2450 which had been approved by the Board in 2002, and referred to MCL 15.268, the "Closed Sessions" section of the Open Meetings Act.

26. The Board and counsel of the Board, counsel Harty, discussed the release of administrator evaluations under FOIA, and that attorney Eric Delaporte of the Thrun Law Firm had advised that many other schools did release them.

27. Plaintiff then returned to work on a reduced hours basis, using her approved FMLA leave for same until December 31, 2014.

28. An article was published in the local newspaper about the release of evaluations, and the administrator's performance evaluations.

29. At a later Board meeting in December, 2014, Plaintiff made a public oral statement about the public release of performance evaluations, and what she had been advised by the Thrun Law Firm about the risks of any administrator performance evaluations being released, without recognition of the limited role the Board plays and how there should be a Board policy for release of any employee evaluations.

30. Several of the Board members were upset with the Plaintiff taking this position and being concerned about potential school district liability for a simple global release of any and all employee evaluations, as well as comments by the Board acting individually, not as a Board.

31. Later, when the minutes were created for this session in January 2015, Fran Seymour and Laura Bonzelet struck through the entire statement of Plaintiff, as if it had never occurred, in violation of the Open Meetings Act, and as a sign of disrespect to Plaintiff.

32. In late January 2015, Plaintiff's elderly mother, Betty Seran, who has lived in Iowa for most of her life, became ill, and because of that Plaintiff exercised her rights under the FMLA to use her available leave on an intermittent and episodic basis to care for her mother.

33. Plaintiff informed Fran Seymour of this before she left for Iowa, and she was gone seven work days.

34. Plaintiff submitted all appropriate forms for use of her FMLA leaves, and was granted leave for her hip replacement in 2014, and her mother's serious medical condition in early 2015.

35. Plaintiff was never designated as a key employee, nor was any question raised by the defendants as to whether or not she was originally entitled to the leaves she was taking until in the fall of 2014 and early 2015.

36. The Defendants raised questions about Plaintiff's legitimate use of FMLA, as well as her sick and personal leave as afforded in her multiple contracts with the Defendants in approximately March of 2015.

37. Defendants were openly hostile to Plaintiff's use of her FMLA, as well as her use of sick and personal time, and complained that it made it too difficult to arrange timely Board meetings, and conduct Board business.

38. Plaintiff was emailed by various Defendants, demanding to know why various projects had not been completed, or evaluations done, while she was on approved FMLA.

39. In her role as Superintendent, Plaintiff often attended "Impact Aid" meetings in other states and cities, particularly Washington, D.C., to lobby for various federal grants and assistance for this rural school district, hemmed in and surrounded by federal parklands.

40. Plaintiff was on a salary, and under contracts that provided for specific numbers of days for sick and personal leave, and was, by Board Policy and law, responsible for the overall supervision and management of the School District per School Board Policy No. 2100.

41. Plaintiff took her work home with her to her house, and emailed work materials to her home email on a regular basis, and worked on nights, weekends and her vacations due to the nature of her position.

42. Plaintiff attended Board meetings and school functions after hours, often late into the night, as part of her normal duties, and earned no additional overtime or pay for this work, other than any additional personal leave or monies placed into her contracts.

43. Plaintiff submitted expense requests for her various trips to Washington, D.C. and out of state, and these were approved by the Board, and her travel paid for by reimbursement and credit card purchases.

44. Plaintiff took so little time off, despite having days available to her, that in her 2013 contract negotiations, Board Members insisted on giving her additional personal days, that could be used as pay if she could not use them for time off.

45. Defendant Seymour advised Plaintiff that Board members were "concerned" about how much time Plaintiff was taking off for FMLA, as well as sick and personal time, and wondered if her time spent off site at Impact Aid events was valuable for the business of the school district.

46. Board members repeatedly complained that Plaintiff was not at the school building enough of the school day, and did not understand why her travel to Impact Aid conferences was beneficial to the schools.

47. Defendant Seymour directly questioned Plaintiff about her use of FMLA and sick time, and told her Board members were not trusting her proper use of the time.

48. Plaintiff responded by noting she was entitled under FMLA and her contract to use the time as she needed, and that she was generally available by email and phone 24/7, and that the nature of her job required her to work nearly all the time, no matter where she was.

49. In March of 2015, Defendants told Plaintiff, while she was on approved FMLA, that the Board wanted an audit done of her use of time off, sick and personal leave.

50. Eric Delaporte of Thrun Law Firm, encouraged the Board to question Plaintiff's use of time off, and advised them that Plaintiff could be stealing or misusing public funds by taking unnecessary time off or traveling.

51. The constant suggestion and outright claims that Plaintiff was somehow abusing or taking public funds without Board approval, amounting to criminal behavior became extremely wearing and frightening to Plaintiff.

52. At the same time, Plaintiff's mother grew increasingly ill, and she was forced to use some of her intermittent FMLA leave to travel to her mother's home in Iowa, which angered Defendants.

53. The Board then acted to appoint elementary Principal Kim Wright to act in Plaintiff's place, and told the administrative staff to not contact Plaintiff while she was on FMLA.

54. Plaintiff hired counsel to assist her in trying to leave or retire early from her position, due to the ongoing stress and undue scrutiny, and untrue accusations that she was misusing FMLA.

55. Plaintiff specifically advised the Board and Defendants she was being retaliated against for her proper, pre-approved use of FMLA and that this was unlawful.

56. Within days of this complaint, the Defendants, at the urging of Eric Delaporte and Fran Seymour voted to launch an investigation by Thrun Law Firm and an accounting firm into various false claims that Plaintiff was stealing time, misusing public funds, and violating various laws in her position as Superintendent, including criminal acts.

57. From April 2015 forward, all Plaintiff's time off was questioned, and she was subjected to public accusations of wrongdoing by Defendants, as she continued to use her approved FMLA time for her mother's worsening medical condition.

58. Defendants deliberately created intolerable working conditions, as would be perceived by a reasonable person.

59. The Defendants did so with the intention of forcing the employee to quit, and as a result, Plaintiff did so.

60. Plaintiff advised the Defendants she would elect to retire early, as the stress of the accusations of criminal conduct were making her unable to sleep, concentrate and care for her family, and she simply could not bear to be accused of criminal actions in her daily work, despite lack of evidence or any criminal prosecution.

61. This was not enough for the Defendants, and they then accused her of falsifying her time off, misusing credit cards, using the School District's money for non-governmental purposes, and continually alleged she was usurping her role as Superintendent, in part by traveling, or working at home on salary.

62. Plaintiff cooperated with the investigation, met with a hired investigator from the firm of Rehmann Robson, provided detailed information about credit card receipts and expenses, her air travel and hotel reservations at Impact Aid conferences, and gave detailed statements about her allocation of personal days for her pension calculations, including statements from past Board members indicating that the 2010 – 2013 and the 2013-2016 Contract provided for use of personal days as part of her compensation for her pension reporting.

63. Plaintiff had worked on behalf of the Glen Lake Community Schools in obtaining over $26 million in federal Impact Aid payments over the course of 9 years and had a stellar employment record, but was subject to a hostile work environment based on her use of FMLA.

64. Mr. Seymour also questioned Plaintiff's travel out of state for Impact Aid organization meetings and lobbying, which resulted in an audit of her travel expenses, and the assignment a board member Cherie Hawkins to attend the Impact Aid conference in March 2015 as well to monitor Plaintiff's activities.

65. Hawkins attended the wrong session of Impact Aid while in Washington, D.C., and attended the ones on students on Indian reservations and military bases, rather than on the Impact Aid sessions related to the 8002 section of the federal statute.

66. 67. Hawkins then falsely reported to the Board at a later meeting that the majority of the participants at these Impact Aid meetings were Board members, and not administrators, implying that Plaintiff was not doing anything valuable at these gatherings.

67. During the course of the "investigation" by an accounting firm, Rehmann Robson, and Eric Delaporte in various allegations of wrongdoing, including alleged criminal conduct, Plaintiff's mother's condition worsened, and she had to use some of her intermittent FMLA leave to go to Iowa.

68. Plaintiff's own health became affected, due to anxiety, depression, lack of sleep and fear of accusations that she was breaking the law, or committing criminal acts, being publicly discussed by the Defendants.

69. Plaintiff was forced by these actions to resign in August 2015, retiring early, and forfeiting a contract bonus payment, unable to bear the 24 hour scrutiny of the ill-founded investigation and care for her mother and herself, and fearful that any use of her time off would be deemed some kind of misuse of public funds.

70. Unfortunately, this did not deter Defendants, who by then had spent (the Defendant Board members) over $70,000 in their quest to find some fault or bad behavior on the part of Plaintiff, to fire her in retaliation for her lawful use of FMLA, and repudiate her contract.

71. Plaintiff submitted her pension data to the State, and requested her 40 hours of unused sick leave, per the Glen Lakes Community Schools long established policy adopted by the Board for retiring administrators.

72. Thrun attorney Eric Delaporte questioned why she believed she was entitled to this payout, delayed it, but ultimately paid it after being directed to the School Board's stated policy on its website.

73. Then, a "report" written by Thrun attorney Eric Delaporte, accusing Plaintiff of alleged various and sundry civil and even criminal transgressions, without substantial basis, was broadly disseminated to the public on and after September 15, 2015.

74. Mr. Delaporte told the public, apparently with the endorsement of a majority of the current School Board, that the Plaintiff incorrectly told the payroll clerk how to report 24 personal days, and that she did so in some untoward manner in order to wrongfully have the School District pay "approximately" $12,000 toward her compensation payments for her pension.

**75.** This was false, as the Board that adopted the contract(s) had a very specific understanding of how the accrued days were to be used in pension calculations, and no one ever questioned their reporting until this sweeping investigation was instituted at the insistence of Mr. Delaporte and Mr. Seymour after Plaintiff used her FMLA time, and after she warned the Board of various legal requirements for release of various documents.

76. Defendants on the Board and their counsel took any action that they could to financially and personally harm Plaintiff despite her effort to simply retire under duress.

77. Actions by the Defendants led to the exclusion of the total of $46,909.64 from the "compensation" and "remuneration" paid to Joan Groening from 2011-2015 for calculation of her pension.

78. Documentation Glen Lake Community Schools provided to the ORS for the August 31, 2015 determination to be made came from the current Board Chair and school officials,

and its lawyer, Mr. Delaporte, of the Thrun Law Firm, in the wake of Plaintiff's resignation from her position and early retirement under duress.

79. Defendants have recklessly accused Plaintiff of allegedly criminal conduct after an 16 year career with Glen Lake Community Schools, using the report dated September 15, 2015, and a yet unreleased allegedly "privilege investigative report" to tar and feather Plaintiff who lives in the community where she is now accused of essentially stealing public monies, and gross mismanagement of the School District.

80. The Defendants deliberately reported information to the State of Michigan Office of Retirement Services in an effort to deny Plaintiff her entitlement to her pension benefits and portray her as having engaged in some kind of wrongful misrepresentation to the State in retaliation for her exercise of her rights under the FMLA, and to interfere in same, as well as her efforts to enforce the law while employed by the school district.

81. Defendants acted with malice, and recklessly as Plaintiff's employer in accusing Plaintiff of criminal conduct and theft, and perpetuating falsely, that Plaintiff was a rogue and criminal administrator, who deserved to be fired.

82. Defendants were not satisfied with Plaintiff's forced early retirement and resignation as a result of their retaliatory actions and claims, but insisted on publicly charging Plaintiff with alleged crimes and theft from the public after she left her formal employment.

83. Eric Delaporte stated in this report that while some of the claimed "allegations" ended up either not being really true or misunderstood, and that there was little to no significant alleged "misuse" of public funds outside of some staff "Glen Lake Community Schools" t-shirts and jackets that he determined the staff should have paid for, as they were "gifts"

11

rather than uniforms, that Plaintiff's actions raised ongoing questions about misuse of her time off, sick leave, personal leave and vague but ominous sounding other transgressions.

84. Delaporte also concluded on behalf of himself and the Defendants that there was no consideration of, or retaliation against Plaintiff for her use of FMLA in his report, despite the report exonerating each and every person involved except Plaintiff.

85. Defendant's true reasons for its various negative employment actions, and constructive discharge described above as to Plaintiff were due to her exercise of her rights to leave under the FMLA.

86. But for her exercise of her rights under FMLA, Plaintiff would not have been subjected to a hostile work environment and adverse actions as described above, including active efforts to get her to quit.

87. These actions by the Defendants were likely to dissuade any reasonable person in Plaintiff's position from exercising her legal rights under FMLA, and to feel compelled to resign.

88. Defendants took these adverse actions, for the intended malicious purpose of getting Plaintiff to forfeit her right to use FMLA leave, and/or resign, and to ruin Plaintiff's ability to find any work in the future in her professional field of education and business management.

89. Defendants knew that this action was in transgression of federal law prohibiting retaliation and interference, and its action was willful and knowing, or reckless and done without regard to whether it not it violated FMLA.

90. With the statements made by Defendants, her prospects for securing alternative employment are bleak.

91. Plaintiff, has lost her remaining salary and all her benefits because of retaliatory constructive discharge by Defendants, as well as pension benefits, and future years of employment until her planned retirement age.

### Count I) Violation of the Family and Medical Leave Act, 29 U.S.C. § 2615, *et. seq.* Interference in Exercise of Rights Under FMLA

Plaintiff incorporates all prior averments in paragraphs *1-91*, as if fully set forth herein.

92. Plaintiff qualified as an eligible "employee" under the FMLA.

93. Defendants all qualify as "employers" under the FMLA.

94. Plaintiff was qualified for FMLA leave under 29 U.S.C. § 2611 and 29 U.S.C. § 2612.

95. The medical conditions which resulted in the plaintiff's absence from work in 2014-2015 were serious health conditions within the meaning of 29 U.S.C. § 2612 and 29 C.F.R. § 825.114.

96. Plaintiff provided Defendant with adequate, timely and sufficient notice under the circumstances of her need for leave and approved same.

97. Defendants were all aware of Plaintiff's use of FMLA leave.

98. Defendants were angry and upset of the use of FMLA leave by Plaintiff, and deliberately took adverse employment actions against Plaintiff, after she asserted and maintained her right to use the leave, and when she complained of discrimination when questioned by Defendants in violation of 29 C.F.R. § 825.220 and 29 U.S.C. § 825.220.

99. Defendants also interfered with her use of leave, deliberately taking actions to force Plaintiff to work while on approved FMLA leave, by holding Board meetings requiring her attendance while she was on approved leave for her hip replacement in the fall of 2014, and certain Defendants making derogatory public comments about her being on leave at the time certain policy decisions were being made.

100. The Defendants also took adverse action by launching an unsubstantiated quasi-criminal investigation targeting Plaintiff for alleged misconduct including criminal behaviors in her position as Superintendent in retaliation for her insistence on proper, lawful use of her FMLA time immediately after Plaintiff complained of their attempted interference and retaliation prohibited by FMLA, trying to get her to quit.

101. The investigation, and resultant report was caused by Defendant's ire and anger over Plaintiff's insistence on her rights under the law, and complaints of retaliation, and designed to harm her personally and professionally, and dissuade her from use of FMLA leave, which was mere pretext for unlawful retaliation.

102. A person of ordinary firmness would indeed be chilled and discouraged in his or her exercise of FMLA leave rights due to the actions of Defendants in creation of a hostile work environment in retaliation therefore, and intended to make her resign.

103. As a direct and proximate result of the Defendant's violations of the FMLA and the regulations promulgated thereunder, the Plaintiff has incurred all damages available at law, both past, present and into the future, and all damages set forth in 29 U.S.C. § 2617, including but not limited to lost wages, lost salary, loss of employment benefits, loss of other compensation denied and lost, cost of care, medical expenses, interest, costs of litigation, attorney fees and liquidated damages equal to the sum set forth in 29 U.S.C. § 2617. Plaintiff hereby seeks recovery of all such damages incurred, and those that will be incurred in the future.

104. WHEREFORE the plaintiff respectfully prays for judgment against the defendant for all consequential and compensatory damages, liquidated damages and equitable remedies available under FMLA, exemplary damages, and economic damages, including back pay and front pay, and value of continued benefits, available at law, together with costs, interest and reasonable attorney fees incurred in having to investigate, pursue, litigate and prosecute the instant action.

### Count II) Violation of the Family and Medical Leave Act, 29 U.S.C. § 2615, *et seq.* Retaliation for Exercise of Rights Under FMLA

Plaintiff incorporates all prior averments in paragraphs *1-104*, as if fully set forth herein.

105. Plaintiff qualified as an eligible "employee" under the FMLA.

106. Defendants all qualify as "employers" under the FMLA.

107. Plaintiff was qualified for FMLA leave under 29 U.S.C. § 2611 and 29 U.S.C. § 2612.

108. The medical conditions which resulted in the plaintiff's absence from work in 2014-2015 were serious health conditions within the meaning of 29 U.S.C. § 2612 and 29 C.F.R. § 825.114.

109. Plaintiff provided Defendant with adequate, timely and sufficient notice under the circumstances of her need for leave and approved same.

110. Defendants were all aware of Plaintiff's use of FMLA leave.

111. Defendants were angry and upset of the use of FMLA leave by Plaintiff, and deliberately took adverse employment actions against Plaintiff, after she asserted and maintained her right to use the leave, and when she complained of discrimination when questioned by Defendants in violation of 29 C.F.R. § 825.220 and 29 U.S.C. § 825.220.

112. Defendants also interfered with her use of leave, deliberately taking actions to force Plaintiff to work while on approved FMLA leave, by holding Board meetings requiring her attendance while she was on approved leave for her hip replacement in the fall of 2014, and certain Defendants making derogatory public comments about her being on leave at the time certain policy decisions were being made.

113. The Defendants also took adverse action by launching an unsubstantiated quasi-criminal investigation targeting Plaintiff for alleged misconduct including criminal behaviors in her position as Superintendent in retaliation for her insistence on proper, lawful use of her FMLA time immediately after Plaintiff complained of their attempted interference and retaliation prohibited by FMLA, trying to get her to quit.

114. The investigation, and resultant report was caused by Defendant's ire and anger over Plaintiff's insistence on her rights under FMLA, and complaints of retaliation, and designed to harm her personally and professionally, and dissuade her from use of FMLA leave, which was mere pretext for unlawful retaliation.

115. A person of ordinary firmness would indeed be chilled and discouraged in his or her exercise of FMLA leave rights due to the actions of Defendants in creation of a hostile

work environment in retaliation therefore, as Plaintiff indeed was, and these actions were intended to make Plaintiff resign or quit.

116. As a direct and proximate result of the Defendant's violations of the FMLA and the regulations promulgated thereunder, the Plaintiff has incurred all damages available at law, both past, present and into the future, and all damages set forth in 29 U.S.C. § 2617, including but not limited to lost wages, lost salary, loss of employment benefits, loss of other compensation denied and lost, cost of care, medical expenses, interest, costs of litigation, attorney fees and liquidated damages equal to the sum set forth in 29 U.S.C. § 2617. Plaintiff hereby seeks recovery of all such damages incurred, and those that will be incurred in the future.

117. WHEREFORE the plaintiff respectfully prays for judgment against the defendant for all consequential and compensatory damages, liquidated damages and equitable remedies available under FMLA, exemplary damages, and economic damages, including back pay and front pay, and value of continued benefits, available at law, together with costs, interest and reasonable attorney fees incurred in having to investigate, pursue, litigate and prosecute the instant action.

                                                        RESPECTFULLY SUBMITTED,

October 15, 2015                     EARDLEY LAW OFFICES, P.C.
                                                        Counsel for Plaintiff

                                                        */s/ Eugenie B. Eardley*
                                                        Eugenie B. Eardley (P48615)
                                                        8 East Bridge St, Suite B
                                                        Rockford, Michigan 49341
                                                        (616) 874-2647

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

JOAN GROENING,

    Plaintiff,     Case No. 15-cv-

v.     Hon.

GLEN LAKE COMMUNITY SCHOOLS,
FRAN SEYMOUR, ROSS HAZELTON,
CHERIE HAWKINS, LAURA AYLSWORTH-BONZELET,
and PATRICK MIDDLETON,

    Defendants.

Eugenie B. Eardley (P48615)
Nicholas F.X. Gumina (P74023)
Attorneys for Plaintiff
Eardley Law Offices, P.C.
8 East Bridge St, Suite B
Rockford, MI 49341
(616) 874-2647
genieb@eardleylaw.com
nickg@eardleylaw.com

## **JURY DEMAND**

The Plaintiff, Joan Groening, by and through her attorneys, Eardley Law Offices, PC hereby demands a trial by jury as afforded under the Family Medical Leave Act.

RESPECTFULLY SUBMITTED,

October 15, 2015     EARDLEY LAW OFFICES, P.C.
    Counsel for Plaintiff

    */s/ Eugenie B. Eardley*
    Eugenie B. Eardley (P48615)
    8 East Bridge St, Suite B
    Rockford, Michigan 49341
    (616) 874-264