UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOAN GROENING,

    Plaintiff,

v.

GLEN LAKE COMMUNITY SCHOOLS,
FRAN SEYMOUR, ROSS HAZELTON,
CHERIE HAWKINS, LAURA AYLSWORTH-
BONZELET, and PATRICK MIDDLETON,

    Defendants.

                                        /

Case No. 1:15-CV-1068

HON. GORDON J. QUIST

## OPINION

Plaintiff, Joan Groening, has sued Defendants, Glen Lake Community Schools, Fran Seymour, Ross Hazelton, Cherie Hawkins, Laura Aylsworth-Bonzelet, and Patrick Middleton, alleging that they violated the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, by interfering with her exercise of her rights under the FMLA and by retaliating against her for exercising her FMLA rights. Regarding the retaliation claim, Groening alleges that Defendants' retaliation was in the form of a constructive discharge. Defendants move for summary judgment on both of Groening's claims. The Court heard oral argument on the motion on June 8, 2017.

For the reasons set forth below, the Court will grant Defendants' motion as to both claims.

### I. FACTS

**A.    The Parties**

Groening was employed by Glen Lake Community Schools (Glen Lake) as its Superintendent from 2006 until August of 2015, when she resigned from her position. Glen Lake

is a Michigan school district located near the Sleeping Bear Dunes. Defendants Seymour, Hazelton, Hawkins, Aylsworth-Bonzelet, and Middleton were members of the Glen Lake School Board during the period of time relevant to Groening's claims.

**B.     Relevant Facts Regarding Groening's Tenure**

During her years as Superintendent, Groening initiated and oversaw Glen Lake's participation in Federal Impact Aid (Impact Aid), a federal program that compensates local school districts and other governmental entities for loss of property tax revenues when real property is removed from the local tax base as a result of the federal government's property acquisition (in Glen Lake's case, Sleeping Bear Dunes). (ECF No. 59-1 at PageID.189; ECF No. 59-3 at PageID.248.) Groening's efforts resulted in Glen Lake being awarded millions of dollars in federal aid that substantially improved the district's financial position. (*Id.*; ECF No. 62-2 at PageID.512.) As part of her involvement in Impact Aid, Groening often attended meetings in Washington, D.C. and other major cities during the school year. (ECF No. 59-3 at PageID.248.)

In 2013, Groening's working relationship with the school board changed when Fran Seymour was appointed a board member. Seymour was considered a no-nonsense businessman who asked tough questions and demanded answers. Former board members described Seymour as "brash," "condescending," and rude toward Groening. (ECF No. 59-11 at PageID.303; ECF No. 72 at PageID.1329.) Groening, on the other hand, was often cold toward Seymour and, at times, was evasive and would not answer Seymour's questions. (ECF No. 59-9 at PageID.288.) In short, Seymour and Groening had strong personalities that often clashed. (ECF No. 59-8 at PageID..283.) In January 2014, Seymour was elected president of the school board. Seymour's style—considered more demanding of Groening—was much different than that of former board president Jennifer Ozmera. (ECF No. 72 at PageID.1329.)

2

An issue of contention both prior to and during Seymour's leadership was access to administrators' performance evaluations. Seymour and other board members, including Cherie Hawkins, thought that the board should have access to such evaluations when considering Groening's proposals for administrator raises and contract renewals. (ECF No. 59-28 at PageID.440.) Groening told the board members that the evaluations were confidential and that they could not review them.[1] (ECF No. 59-6 at PageID.270.)

In 2013 and 2014, the school board discussed the possibility of a board member attending Impact Aid conferences with Groening to become familiar with the process and prepare to take over for Groening when she eventually left Glen Lake. (ECF No. 59-7 at PageID.278.) Groening resisted the suggestion, stating that school board members do not attend the conferences. Ultimately, the board choose to send Cherie Hawkins to attend the March 2015 conference in Washington, D.C. (ECF No. 59-3 at PageID.249.) When Hawkins returned from the conference, she reported that, contrary to what Groening had stated, numerous other board members had attended the conference. Hawkins suggested that Groening was not being truthful when she said that only administrators attended the conferences. (*Id.*)

Groening's last evaluation as Glen Lake's Superintendent was finalized in August 2014, for the 2013–14 school year. Groening received an overall rating of "highly effective," with high marks in many areas, including the financial condition of the district, but lower marks in student achievement. Among the individual board members, three board members (Omerza, Bonzelet, and

---

[1] Although some board members felt that Groening was not being forthcoming with them about whether they were entitled to review administrator evaluations, Groening maintains that she relied on current policy and discussions with legal counsel Kevin Harty for her position that evaluations should not be made available to board members. (ECF No. 64 at PageID.457l ECF No. 59-1 at PageID.219.) Whether Groening misunderstood attorney Harty's advice, was simply mistaken about whether board members could review the evaluations, or actively misled board members is immaterial for purposes of the instant motion. The point is that some board members believed that Groening was not being up front with them.

Goodrick) gave Groening overall scores falling in the "highly effective" category and four board members (Seymour, Middleton, Hawkins, and Hazelton) gave her overall scores falling in the "effective" category. (ECF No. 59-12 at PageID.308–09, 14–15, 22.)

**C.  Groening Takes FMLA Leave**

In the fall of 2014, Groening took medical leave for hip replacement surgery and submitted the required FMLA documents to Glen Lake's Business Manager for approval. Groening informed the school board of her contractual medical leave, although she did not specifically inform the board members that she was taking FMLA leave. Groening's leave began on October 17, 2014. (ECF No. 59-1 at PageID.210.) She returned to work on December 1, 2014, and worked half days through the end of December. (*Id.* at PageID.224.)

Prior to taking leave, Groening participated in the selection of Mike Hartigan—a retired public school superintendent—to serve as Interim Superintendent during her absence. (*Id.* at PageID.214.) The school board did not require Groening to work while she was on FMLA leave. (*Id.* at PageID.225.) Nor did Hartigan ask or require Groening to do any work while on FMLA leave. (ECF No. 59-20 at PageID.377.) In addition, the school board told Groening's staff not to contact her. (ECF No. 59-1 at PageID.239.) However, being the head of the school district, Groening wanted to be copied on emails and other communications to keep apprised of what was going on while she was away. (*Id.*)

While Groening was on leave, the board continued to work on the superintendent evaluation tool, which was a work in progress. On October 17, 2014, Seymour sent Groening an email stating that he would get feedback from the board while she was on leave and that, when Groening returned, he, Groening, and the consultant Groening had retained could meet to determine what the evaluation tool would look like. (ECF no. 67-2 at pageID.1235.) Groening responded that she

4

would look at the tool the next week. A day later, Seymour told Groening that he hoped her surgery went well and that she was feeling better, and that he would "rather [she] take the time to heal" instead of working on the tool while on leave. (*Id.*) Groening nonetheless elected to provide substantial comments on the evaluation tool during her leave.

On November 19, 2014—while on leave—Groening emailed Seymour to ask him about topics that he wanted to cover at the upcoming board meeting. (ECF No. 67-4 at PageID.1243.) About a half hour later, Groening sent out an email to the board stating that she had made arrangements for food to be served at the meeting. (*Id.* at PageID.1242.) Shortly thereafter, Groening sent Seymour an email offering to send out a list of agenda items for the meeting. (*Id.* at PageID.1243.) The following week, the board held a closed session with its legal counsel, Kevin Harty, to discuss two sections of the Revised School Code. (ECF No. 59-1 at PageID.224; ECF No. 67-3 at PageID.1238.) Groening attended the meeting even though she was not required to do so. (ECF No. 59-1 at PageID.225.) Board access to employee evaluations, while not a planned topic, came up at the meeting. Harty informed the board members that employee evaluations are subject to FOIA requests and that the board members had a right to review them. (ECF no. 59-13 at PageID.326.) After receiving the information from Harty, several board members concluded that Groening had misled them about their right to review administrator evaluations.

Groening took FMLA leave again around the end of January and into February, 2015, to care for her mother. (*Id.* at PageID.231.) After she returned in February, Groening took a vacation for two weeks. (*Id.*) In March, shortly after returning from vacation, Groening took additional FMLA leave to care for her mother, and, later in March, attended an Impact Aid conference. (*Id.*) Groening planned to attend another Impact Aid conference in April 2015. Given the amount of time Groening had been away from the district, Seymour asked Groening to confirm that her attendance at the conference would not affect her ability to do her job. (*Id.*)

On March 30, 2015, Groening's attorney sent a letter to Glen Lake's counsel stating that Groening planned to retire at the end of her contract, on June 30, 2016. Groening's counsel also stated that, since her request and approval for FMLA leave in 2014, Groening had "experienced hostility and apparent retaliation" from various members of the board. (ECF No. 59-16.)

**D.     The Investigation**

In early March 2015, because of the impact that Groening's absences were having on the board's conduct of school business, and because Groening's contract provided for payment of unused leave time at the end of the contract year, some board members, including Bonzelet, expressed concern about how Groening was using or reporting her leave. On March 11, 2015, Seymour sent an email to Groening requesting that she provide a breakdown of her vacation and sick days for the current contract year. (ECF No. 64-15 at PageID.726.) Groening responded to the request by providing a spreadsheet listing the days she had taken off for vacation and sick time. (ECF No. 59-3 at PageID.248, 255.) The spreadsheet was not an official school document kept in the regular course of business and thus caused some board members to question how the district tracked leave time, not only for Groening, but for other administrators as well. (*Id.* at PageID.248.) Around the same time, Joan Hawley, a former school board president, appeared at a board meeting and accused the board of breaking the law by approving Hawkins's travel expenses to attend the Impact Aid conference. (ECF No. 59-15 at PageID.332.)

Later in March, Seymour spoke to attorney Eric Delaporte, another member of the Thrun Law Firm that acted as counsel to Glen Lake, about the board's concerns that Groening was not providing them complete or accurate information about the management of the school district. Seymour pointed to Groening's refusal to provide administrators' performance evaluations, the unverified spreadsheet that she provided in response to the request for an accounting of time off, Groening's frequent absences from the district's offices and telling her staff that she was working

6

from home, and the complaint by Joan Hawley about allegedly unlawful approval of expenses for board members. (ECF No. 59-17 at PageID.343–44.) Delaporte recommended that the board retain Rehmann Corporate Investigative Services to perform a district-wide audit to review these issues. (*Id.* at PageID.344.)

On April 30 2015, the board voted 6-1 to authorize an audit by the Thrun firm and Rehmann of certain of the school district's financial matters. (ECF No. 59-18.) The audit was conducted by attorney Delaporte and William Kowalski of Rehmann. During the audit, central office staff employees were interviewed. To ensure that employees would feel free to speak with the investigators and provide information, Delaporte recommended that Groening be placed on paid administrative leave for two days. (ECF No. 59-17 at PageID.344.) The results of the audit were provided to the board on August 18, 2015. (*Id.* at PageID.345.) On August 17, 2015—one day prior to the release—Groening submitted her resignation to the board. (ECF No. 59-2.)

## II. DISCUSSION[2]

Groening has sued Defendants under the FMLA, seeking damages for the compensation she would have earned between the date of her resignation and the date of her planned retirement.

The FMLA provides two different types of claims or theories of liability. *See Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003). The "entitlement" or "interference" theory is based upon the substantive rights created by the FMLA. *Arban*, 345 F.3d at 401. An employer is liable under this theory if it interferes with an employee's FMLA-created right to medical leave or to reinstatement following the leave. 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title."). To prevail

---

[2]Because the Court and the parties are familiar with the well-known standard of review for summary judgment motions brought under Rule 56, the Court finds it unnecessary to recite the standard.

on this type of claim, an employee need only show that she was denied an entitlement under the FMLA. *Hoge*, 384 F.3d at 244. The employer's intent is irrelevant to such a claim. *Id.*; *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).

The second type of FMLA claim is a "retaliation" or "discrimination" theory. *See* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title."); *see also* 29 C.F.R. § 825.220(c) (prohibiting employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").

**A.     Interference Claim**

In order to establish an interference claim, a plaintiff must show that: (1) she was an eligible employee; (2) the defendant is a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave the defendant notice of her intent to take leave; and (5) the defendant denied her FMLA benefits or interfered with FMLA rights to which she was entitled. *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

Because it is undisputed that Groening submitted proper FMLA documentation to the appropriate personnel at Glen Lake, only the fifth element—whether Glen Lake denied Groening FMLA benefits or interfered with her protected rights—is at issue.

Although Groening took all of the FMLA leave she requested and no board member objected to her taking FMLA leave, Groening nonetheless argues that Defendants interfered with her FMLA rights.

First, Groening argues that the school board communicated and questioned her on an almost daily basis while she was on FMLA leave. The record contradicts this assertion. The school board did not demand that Groening respond to its questions and communicate with board members while on leave, as Groening claims. Groening herself initiated contact not only with board members, but

also with other school officials and representatives, such as Interim Superintendent Mike Hartigan and Glen Lake's counsel Kevin Harty. (ECF No. 59-20 at PageID.377 (Hartigan confirming that Groening initiated conversations with him about work); ECF No. 59-13 at PageID.325 (Harty stating that, although he told Groening that she should not concern herself with school business while on leave, Groening initiated contact with him to conduct school district business).) More importantly, Groening, herself, admits that she wanted to be copied on emails and correspondence to stay apprised of school business and that no one required her to attend meetings while she was on leave. (ECF No. 59-1 at PageID.225, 239.) Given that Groening was not a machine operator or an office clerk whose duties could be assigned to another employee, but instead essentially the CEO of Glen Lake, it is not surprising that she would want to stay abreast of, if not involved with, school business. Moreover, the school board was not required, as Groening would have it, to suspend operations or refrain from dealing with issues that might have pertained to Groening while she was on leave. The board's decision to address such matters while Groening was on leave is thus not evidence of interference with Groening's FMLA rights.

In *Tilley v. Kalamazoo County Road Commission*, 654 F. App'x 675 (6th Cir. 2016), the Sixth Circuit indicated that an employer does not violate the FMLA by contacting an employee on leave with work-related questions. The Court recognized that "multiple phone calls from an employer and demands to complete more than simple tasks could rise to the level such that an employee's FMLA leave becomes unjustifiably disrupted and thereby discouraged." *Id.* at 680. On the other hand, "de minimis contact" about work-related issues that does little to disrupt the employee's leave does not constitute unlawful interference. *Id.* In the instant case, the evidence shows that Groening not only initiated, but invited, contact from board members and school officials. In this regard, Seymour's request to Groening while she was on leave for a breakdown of

9

the days she had taken for vacation and sick time for an upcoming board meeting was the "type of de minimis contact [that] did little, if anything, to disrupt [Groening's] FMLA leave."[3] *Id.*

Second, Groening argues that board members openly expressed their frustration that Groening was taking FMLA leave. But such frustration was because Groening was gone from the district so often in 2014, not only for FMLA leave, but also for two weeks of vacation and to attend Impact Aid conferences. For example, the email Groening cites from defendant Bonzelet on March 9, 2015, shows that Bonzelet was essentially complaining that Groening's absence from the district affected the board's ability to conduct school business. Moreover, Bonzelet was essentially stating that the meeting should be moved to a date when Groening could attend so that two meetings would not be held to discuss the same issues, as had happened previously. (ECF No. 64-15 at PageID.708–09.) This was a legitimate gripe and, in any event, Groening fails to explain how it interfered with her leave or affected her employment.[4]

Finally, Groening suggests that the board's request for clarification as to what type of leave she was taking (vacation, FMLA, or paid sick leave under her contract), and the board's approval of the audit constituted unlawful interference. Groening fails to explain how an entirely legitimate request for clarification from the school board—the public body charged with oversight of the

---

[3]In her brief, Groening states that although Seymour told her that he did not expect her to work on the evaluation tool while on leave, "he also insisted that she do it or face the harsh reality that the board was actively and substantively changing the tool and *adding goals mid-year that she would never be able to reach due to her use of FMLA*." (ECF No. 64 at PageID.456 italics in original).) Groening cites no evidence for this statement. Moreover, her suggestion that the board was always changing the goals mischaracterizes the record. Defendant Bonzelet actually said that the "state requirements . . . were constantly changing," (ECF No. 64-4 at PageID.530), not that the board was changing the goals.

[4]Groening cites a number of emails between board members to which she was not a party—for example, Seymour's email to Bonzelet stating that Groening's use of vacation and other leave would be subject to accountability on her annual evaluation—to argue that Defendants sought to use Groening's FMLA leave against her. Because Groening did not learn of these emails until after she resigned and after this lawsuit was filed, they have no probative value as to the interference claim, as they do not show that any board member actually used Groening's FMLA leave against her. Nor are those emails relevant to establish intolerable working conditions, for her retaliation claim.

school district and responsibility to ensure that Groening was following her contract—interfered with her FMLA rights. Citing *Wysong v. Dow Chemical Co.*, 503 F.3d 441 (6th Cir. 2007), Groening argues that the audit, as well as her placement on administrative leave during the audit, constituted inference with her rights under the FMLA because Defendants used her leave to justify the audit. Groening's reliance on *Wysong* is misplaced. The *Wysong* court said that the fifth element of an interference claim could be satisfied by showing that "the employer has 'somehow used the leave against [the plaintiff] and in an unlawful manner, as provided in either the statute *or* regulations.'" *Id.* at 447 (quoting *Bradley v. Mary Rutan Hosp.*, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004)). The court further noted that employers cannot use FMLA leave "'as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Id.* (quoting 29 C.F.R. § 825.220(c)). The plaintiff in *Wysong* alleged that she was terminated because she had previously taken FMLA leave, and a company physician had used her leave in formulating work restrictions with which the plaintiff could not comply. *Id.* at 447–48. Here, of course, the school board took no materially adverse employment action against Groening as a result of her FMLA leave. The audit itself did not effect a change in Groening's pay, responsibilities, or other aspects of her employment, and therefore cannot be considered an unlawful use, as set forth in *Wysong*. *See Murphy v. Ohio State Univ.*, 549 F. App'x 315, 321 (6th Cir. 2013) (holding that an investigation that does not effect a change in an employee's pay or job responsibilities does not "satisfy the materially adverse employment action element"). Similarly, Groening's placement on paid administrative leave during the audit was not an unlawful use of her FMLA leave. "[N]either an internal investigation into wrongdoing by an employee nor that employee's placement on paid administrative leave pending the outcome of such an investigation constitutes an adverse employment action." *Dedinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) (citing *Peltier v.*

11

*United States*, 388 F.3d 984, 988 (6th Cir. 2004)); *see also Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007–08 (8th Cir. 2012) (holding that "[p]lacement on paid administrative leave pending an investigation does not meet [the materially adverse action] standard").

Groening's interference claim thus fails as a matter of law.

**B.    Retaliation claim**

The *McDonnell Douglas* burden-shifting framework is applicable to FMLA retaliation claims where the plaintiff relies on circumstantial evidence. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001). Groening's retaliation claim fails because she cannot establish a prima facie case.

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2012)). The adverse action Groening alleges in this case is constructive discharge.

> To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit. . . . To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.

*Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (quoting *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001)). In determining whether a reasonable person would feel compelled to resign, the Sixth Circuit considers the following non-exclusive list of factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 451 (internal quotation marks and citations omitted). Hurt feelings, criticisms, and public challenges are insufficient to establish constructive discharge. *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012).

Groening fails to present evidence to establish a constructive discharge. Initially, the Court notes that Groening fails to rebut Defendants' evidence that they were not aware that Groening was taking FMLA leave until March of 2015. Although Groening has shown that she submitted appropriate FMLA documentation to the proper school district officials, she fails to rebut Defendants' evidence that they did not know Groening was taking FMLA leave—as opposed to paid sick time under her contract—before March of 2015. Thus, Defendants' conduct before that time cannot be considered retaliatory. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 387 n.3 (6th Cir. 1999) (en banc) (stating that "the defendant must have known about the protected activity in order for it to have motivated the adverse action").

Even if the events or circumstances prior to March 2015 are considered in determining whether Groening's working conditions were intolerable, Groening still fails to show that "a reasonable person in [Groening's] shoes would feel compelled to resign." *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1127 (6th Cir. 1998). In arguing that her working conditions were so bad that she was essentially fired, Groening relies heavily on the audit, arguing that Defendants "spearheaded a forensic audit into [her] leave to try to find some evidence of wrongdoing so they could get rid of her." (ECF No. 64 at PageID.475.) Groening cites no evidence for her claim that

the purpose of the audit was to unearth a reason to get rid of her.[5] As set forth above, attorney Delaporte recommended the audit to Seymour as a means of addressing his concerns about Groening not providing complete or accurate information about the management of the school district. The fact that accounting of Groening's leave time was one facet of the audit is of no moment. Defendants have shown that board members had legitimate concerns about a number of issues, and they were justified, if not compelled by their legal and civic obligations, to seek answers to their questions about the financial management of the school district. In fact, the executive summary of the results prepared by the Thrun firm shows that the audit was not limited in scope to accounting for leave time or to Groening, in particular.[6] (ECF No. 59-19.) Moreover, as already discussed, the audit, and placement of Groening on paid leave for two days, did not constitute adverse employment actions, and provide no support for a constructive discharge. *See Levenstein v. Salafsky*, 414 F.3d 767, 775 (7th Cir. 2005) (stating that "a person who is on leave with pay, with a temporary (though unsatisfying) reassignment pending an investigation of serious job misconduct, who resigns rather than waits for the conclusion of reasonable prescribed due process procedures of the institution, has not from an objective standpoint been constructively discharged").

The remaining circumstances Groening cites do not support a constructive discharge claim. Groening took all of the FMLA leave she requested, was not required to work while on leave, and no board member complained to Groening about her taking FMLA leave. Statements by board

---

[5] Groening cites testimony from Meredith Goodrick, the only board member who was not named as a defendant, that she felt like Groening was being targeted because Groening was the only employee who had to stay home and had to turn her phone in. (ECF No. 64-5 at ECF No. 64-5 at PageID.545.) Of course, Goodrick's testimony fails to consider that Groening—unlike other employees—supervised employees in the central office and might have influenced their cooperation if she were present, and it was the investigators, not Seymour or any other board member, who made the reasonable decision that Groening should stay home on paid leave. Moreover, Goodrick testified that she believed that the board authorized the audit not "just [for] FMLA, but the time off, the accounting for the – the expense reports for the conferences and that too." (*Id.* at PageID.551.)

[6] Of course, issues of financial irregularities and mismanagement would naturally fall on Groening, as the head of the school district.

members reported in the local newspaper relating to Groening not releasing administrator evaluations to the board and comments about Groening's unavailability for meetings do not amount to circumstances creating an intolerable work environment. *See Keller v. Allstate Ins. Co.*, 146 F. App'x 764, 765–66 (6th Cir. 2005) (noting that criticisms and difficult or unpleasant working conditions would not compel a reasonable person to resign). Groening's claim that Defendants continually altered her evaluation tool, making it impossible for her to achieve the goals during the school year, is unsupported by the record. Finally, Groening's arguments based on emails solely between board members are irrelevant, as Groening was unaware of them and they therefore could not have impacted Groening's working conditions.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment and dismiss Groening's complaint with prejudice.

An Order consistent with this Opinion will enter.


Dated: June 27, 2017             /s/ Gordon J. Quist
                                            GORDON J. QUIST
                                  UNITED STATES DISTRICT JUDGE